IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 16-cv-02706-MSK

KURTIS S. WARREN,

　　Plaintiff,

v.

NANCY BERRYHILL, Acting Commissioner of the Social Security Administration,

　　Defendant.

## OPINION AND ORDER REVERSING AND REMANDING DISABILITY DETERMINATION

**THIS MATTER** comes before the Court as an appeal from the Commissioner's Final Administrative Decision ("Decision") determining that the Plaintiff Kurtis S. Warren is not disabled within the meaning of §§216(i) and 223(d) of the Social Security Act. Having considered all of the documents filed, including the record **(#14)**, the Court now finds and concludes as follows:

## JURISDICTION

The Court has jurisdiction over an appeal from a final decision of the Commissioner under 42 U.S.C. § 405(g). Mr. Warren sought disability insurance benefits under Title II of the Social Security Act based on mental and physical impairments that rendered him unable to work as of January 17, 2012. The state agency denied his claim. He requested a hearing before an Administrative Law Judge ("ALJ"), who issued an unfavorable decision. Mr. Warren appealed to the Appeals Council, which denied his request for review, making the ALJ's determination the final decision of the Commissioner. Mr. Warren timely appealed to this Court.

1

## STATEMENT OF FACTS

The Court offers a brief summary of the facts here and elaborates as necessary in its analysis.

Mr. Warren was born on August 14, 1963. He only attended school to the tenth grade and has worked as a plumber's assistant and a construction worker. At the time of the Decision, he worked part-time at an assisted living facility managed by his wife. He contends that physical and mental impairments prevent him from working on a full-time basis.

Mr. Warren suffers from multiple physical impairments. In 2000, he underwent lumbar fusion surgery and was diagnosed in 2012 with degenerative disc disease. In 2013, he strained his lower back while lifting a stove and later began experiencing neck pain. He now has difficulty lifting and bending and complains of constant neck and back pain, which also radiates down his legs and to his toes. In 2008, he underwent total knee replacement surgery for his left knee and arthroscopy for his right knee. However, he still complains of knee pain. In December 2011, he began receiving treatment for chronic shoulder pain and has undergone surgery on both shoulders. He has diminished range of motion in each shoulder and began reporting in 2013 that he suffered from increasing pain in them. Mr. Warren also suffers from obesity, coronary artery disease, hypertension, diabetes mellitus, and colitis.

In addition to his physical impairments, Mr. Warren began suffering from anxiety and depression in 2011. His primary care physician, Dr. Robert Heyl, diagnosed him with bipolar affective disorder. Dr. Heyl attempted to treat Mr. Warren's condition with a variety of medications but had difficulty developing an effective treatment regimen. In 2013, Mr. Warren began receiving treatment from Dr. Lori Raney, a psychiatrist. Dr. Raney questioned Dr. Heyl's bipolar diagnosis and diagnosed Mr. Warren with generalized anxiety disorder and post-

traumatic stress disorder. Later, she determined that Mr. Warren suffered from major depression and not post-traumatic stress disorder.

**Treatment and Opinions by Treating Professionals**

As stated, Dr. Raney began treating Mr. Warren in 2013. She filled out a Mental Residual Functional Capacity Statement and a questionnaire in support of Mr. Warren's disability claim. She opined that Mr. Warren's mental health prognosis was limited because of his poor response to medication and that his abilities to understand, remember, and carry out very short and simple instructions, to make simple work-related decisions, and to ask questions or request assistance preclude his performance for 5% of an eight-hour working day; his abilities to remember locations and work-like procedures, to work in coordination with or in proximity to others without being distracted by them, to interact appropriately with the general public, to get along with others without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior, to adhere to basic standards for neatness and cleanliness, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to travel in unfamiliar places or use public transportation preclude his performance for 10% of an eight-hour working day; and his abilities to understand, remember, and carry out very detailed instructions, to maintain attention and concentration for extended periods of time, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, and to set realistic goals or make plans independently of others preclude his performance for 15% or more of an eight-hour working day.

Dr. Raney further opined that Mr. Warren would likely be absent from work five days or more each month; he would be unable to complete an eight-hour working day five days or more each month; and compared to an average worker, he could only be expected to perform a job less than 50% of the time on a sustained basis.

Dr. Heyl has treated Mr. Warren since 2000 for his physical and mental impairments. Dr. Heyl filled out a Physical Medical Source Statement in support of Mr. Warren's disability claim. According to Dr. Heyl, Mr. Warren can sit for one to two hours at one time, stand for twenty minutes at one time, and sit and stand/walk for less than two hours total in an eight-hour working day; he must be able to walk for three to five minutes every ten minutes; he requires four to six unscheduled breaks during a workday that would each last for fifteen to twenty minutes; he is unable to lift more than twenty-five pounds but can lift five pounds continuously, ten pounds frequently, and twenty pounds occasionally; he can bend or stoop occasionally and reach rarely but should never crawl, kneel, or climb stairs or ladders; while he can use his hands for simple grasping, he cannot use them to push, pull, or finely manipulate objects; he cannot reach or work above shoulder level; he cannot use his legs for repetitive movement. Dr. Heyl further opined that Mr. Warren would be absent from work for four or more days per month.

**Opinions by Non-treating Professionals**

Dr. Eugene P. Toner performed an orthopedic consultative examination for Mr. Warren. He noted that Mr. Warren has full range of motion in his spine, has no weakness to his upper or lower extremities, but has diminished range of motion in his shoulders and neck. He opined that Mr. Warren is not capable of squatting or kneeling, should avoid overhead work, and should not lift more than thirty pounds.

Ed Cotgageorge, Ph.D performed a psychological consultative examination for Mr.

Warren on September 19, 2013, shortly before Mr. Warren began receiving treatment from Dr. Raney. Dr. Cotgageorge opined that Mr. Warren's abilities to follow simple and complex commands and procedures and to manage funds are intact; his ability to sustain attention and concentration is mildly to moderately impaired; his persistence and pace are moderately impaired primarily because of his physical impairments; and his abilities to adapt and to interact socially are markedly impaired.

Dr. Mark Suyeishi, the state agency psychological consultant, reviewed Mr. Warren's file but did not examine him. He opined that Mr. Warren's abilities to remember locations and work-like procedures to understand, remember, and carry out very short and simple instructions, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to ask simple questions or request assistance, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness are not significantly limited; and that his abilities to understand and remember detailed instructions, to maintain attention and concentration for extended periods, and to interact appropriately with the general public are moderately limited. He further opined that Mr. Warren can perform work that does not involve significant complexity or judgment, which could require up to three months to learn the necessary skills to perform, but that he should have limited interpersonal contact.

# THE ALJ'S DECISION

The ALJ analyzed his case pursuant to the sequential five-step inquiry. At step one, the ALJ found that Mr. Warren had not worked or engaged in substantial gainful activity from the alleged onset date of January 17, 2012. At step two, the ALJ found Mr. Warren had medically severe impairments of bilateral rotator cuff syndrome with right biceps tendinosis, degenerative disc disease of the lumber and cervical spine, status post left knee replacement for degenerative joint disease, degenerative joint disease of the right knee, obesity, bipolar disorder, and generalized anxiety disorder. At step three, the ALJ found that Mr. Warren's impairments did not equal the severity of a listed impairment in the appendix of the regulations. At step four, the ALJ first assessed Mr. Warren's Residual Functional Capacity ("RFC") and determined that:

> [Mr. Warren] has the residual functional capacity (see 20 CFR 404.1567(b)) to lift and/ or carry up to 20 pounds occasionally and 10 pounds frequently. He can stand and/ or walk for about six hours and sit for at least six hours in an eight-hour workday. He can never climb ladders and can only occasionally climb stairs. He is able to balance frequently and can occasionally stoop, kneel, crouch, and crawl. He must avoid all exposure to work at unprotected heights and must avoid more than occasional exposure to dangerous moving machinery. He is able to understand, remember, and carry out moderately complex instructions that can be learned and mastered within a three-month period. He is able to sustain concentration, persistence, and pace for these instructions as long as social interactions are not frequent or prolonged. In that environment, he is able to tolerate work changes typical of the low end of semi-skilled work and can travel and recognize and avoid work hazards.

The ALJ then found that Mr. Warren could not perform his past relevant work. However, at step five, the ALJ found that Mr. Warren could perform jobs that exist in significant numbers in the national economy, and thus, he was not disabled.

# ISSUES PRESENTED

Mr. Warren raises multiple objections to the ALJ's decision: (1) the ALJ failed to follow the appropriate legal standard when determining what weight to assign to the opinions of Dr. Raney, Dr. Heyl, Dr. Toner, and Dr. Cotgageorge ; (2) the ALJ's RFC determination is not

supported by substantial evidence; and (3) the ALJ improperly assessed the credibility of Mr. Warren's subjective complaints.

## STANDARD OF REVIEW

On appeal, a reviewing court's judicial review of the Commissioner of Social Security's determination that claimant is not disabled within the meaning of the Social Security Act is limited to determining whether the Commissioner applied the correct legal standard and whether the Commissioner's decision is supported by substantial evidence. *Hamilton v. Sec'y of Health &Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992); *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990); *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003). If the ALJ failed to apply the correct legal standard, the decision must be reversed, regardless of whether there was substantial evidence to support factual findings. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). In determining whether substantial evidence supports factual findings, substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion. *Brown*, 912 F.2d at 1196; *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). It requires more than a scintilla but less than a preponderance of the evidence. *Lax*, 489 F.3d at 1084; *Hedstrom v. Sullivan*, 783 F. Supp. 553, 556 (D. Colo. 1992). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Although a reviewing court must meticulously examine the record, it may not weigh the evidence or substitute its discretion for that of the Commissioner. *Id.*

## ANALYSIS

Mr. Warren argues that the ALJ failed to properly consider the opinions of Dr. Raney, Dr. Heyl, Dr. Cotgageorge, and Dr. Toner. He argues that the ALJ failed to apply the correct

legal standard to Dr. Raney's and Dr. Heyl's opinions and should have given them controlling weight. He further argues that the ALJ failed to consider evidence supporting Dr. Cotgageorge's and Dr. Toner's opinions. The Commissioner responds that the ALJ reasonably evaluated the medical opinions and evidence when determining what weight to give Dr. Raney's, Dr. Heyl's, Dr. Cotgageorge's, and Dr. Toner's opinions. The Court will only address the ALJ's failure to give Dr. Raney's opinions controlling weight because it requires reversal and remand of this matter.

A treating physician's opinion must be given controlling weight if (1) it is well supported by medically acceptable clinical and laboratory diagnostic techniques and (2) it is consistent with the other substantial evidence in the record. *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007). If either of these requirements is not satisfied, however, then the opinion is not accorded controlling weight. To give a treating provider's opinion less than controlling weight, the ALJ must give specific and legitimate reasons. *Drapeau v. Massanri*, 255 F.3d 1211 (10th Cir 2001). This requires that the ALJ be specific in describing how the opinion is unsupported by clinical and laboratory diagnostic techniques, or identify how it is inconsistent with substantial evidence in the record. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).

If a treating physician's opinion is not given controlling weight, its relative weight must be assessed in comparison to other medical opinions in the record. The factors considered for assessment of weight of all opinions are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Allman v. Colvin*, 813 F.3d 1326, 1331–32 (10th Cir. 2016). None of these factors are controlling; not all of them apply to every case, and an ALJ need not expressly discuss each factor in his or her decision. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, "the record must reflect that the ALJ *considered* every factor in the weight calculation." *Andersen v. Astrue*, 319 Fed. App'x 712, 718-19 (10th Cir. 2009)(*emphasis* in original). Finally, just as when an ALJ determines whether to give a treating provider's opinion controlling weight, the ALJ must provide legitimate, specific reasons for the relative weight assigned. *Langley*, 373 F.3d at 1119.

There is no dispute that Dr. Raney was Mr. Warren's treating physician. Dr. Raney opined that Mr. Warren's mental limitations impaired his abilities to understand, remember, and carry out instructions, to make decisions, to ask questions or request assistance, to remember locations and work-like procedures, to work in coordination with or in proximity to others, to interact appropriately with the general public, to get along with others, to maintain socially appropriate behavior, to adhere to basic standards for neatness and cleanliness, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, to maintain attention and concentration for extended periods of time, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to complete a normal workday and workweek, to accept instructions and respond appropriately to criticism from supervisors, and to set realistic goals or make plans independently of others. She also opined that he would be absent from work five days or more each month and would be unable to complete an eight-hour working day five days or more each month.

The ALJ gave these opinions little weight stating,

9

> Dr. Raney's opinions are not well supported by her treatment notes. For instance, she assigns a GAF of 45 in her opinion statements, but treatment notes reflect a GAF of 55. She documented in December 2013, March 2014, and through February 2015, that the claimant continued to cook at the nursing home while she was adjusting his medications. She reflected in her medical source statement that she wonders about cognitive abilities, but her psychiatric evaluation estimates the claimant's intelligence to be in the normal range (Ex. 11F).

This explanation overlooks the obligation of the ALJ to first determine whether Dr. Raney's opinions were entitled to controlling weight before assigning them a relative weight. It appears that the ALJ simply jumped to the assessment of relative weight. Doing so constitutes legal error. *See Krauser v. Astrue*, 638 F.3d 1324, 1330-31 (10th Cir. 2011). But if the reasons articulated by the ALJ would be sufficient for a determination that Dr. Raney's opinions should not be given controlling weight, then the error is harmless. Thus, the Court considers whether the reasons given by the ALJ are sufficient for the determination that Dr. Raney's opinions are not entitled to controlling weight.

The ALJ failed to address the first factor governing whether Dr. Raney's opinions are entitled to controlling weight. There is no discussion in the Decision as to whether they are supported by medically acceptable clinical and diagnostic techniques. Thus, the Court cannot meaningfully review this factor.

However, if Dr. Raney's opinions are not consistent with the substantial evidence in the record – the second factor in the controlling weight analysis – then they are not entitled to controlling weight, even if they are supported by medically acceptable clinical and laboratory diagnostic techniques. With regard to whether a treating physician's opinion is inconsistent with the substantial evidence in the record, the ALJ must specifically identify "those portions of the record with which [the treating physician's] opinion was allegedly inconsistent." *See Krauser v. Astrue*, 638 F.3d 1324, 1331 (10th Cir. 2011). As noted above, the ALJ gave three reasons to

find that Dr. Raney's opinions are not supportable: (1) her medical source statement assigns a GAF score of 45 to Mr. Warren, but treatment notes assign a score of 55; (2) Mr. Warren continued to cook at the assisted living facility; and (3) she questioned Mr. Warren's cognitive abilities in her medical source statement even though her psychiatric evaluation of Mr. Warren notes that his intelligence was within a normal range.

There is a significant problem with the ALJ's criticism that Dr. Raney assigned Mr. Warren different GAF scores in her treatment notes and her medical source statement. As the ALJ herself noted, "An isolated GAF score is not standardized or based on normative data. It is subjective and reflects merely an opinion on symptom severity or functioning from one individual *at one point in time* based on upon [a patient's] self reports." R. 33 (*emphasis* added) (citing *Diagnostic and Statistical Manual of Mental Disorders*, 4th ed., American Psychiatric Assoc., Text Revision, 2000 (DSM-IV)). Inasmuch as a GAF score merely assesses the severity of a patient's symptoms on a specific day, it is subject to change and may vary significantly over the course of treatment. *See Petree v. Astrue*, 260 Fed. App'x 33, 41-42 (10th Cir. 2007). Dr. Raney assigned a GAF score to Mr. Warren only twice. During her initial intake interview with Mr. Warren on October 17, 2013 she assigned him a score of 55. R. 676. On March 6, 2015, she assigned him a score of 45. R. 685. Given the nature of GAF scores, it was reasonable, and even expected, for Dr. Raney to assign different GAF scores to Mr. Warren, especially given the fact that seventeen months separate the scores. Thus, the two GAF scores are not inconsistent, do not undermine the credibility Dr. Raney's opinions, and do not support a finding that Dr. Raney's opinions are not consistent with the substantial evidence in the record.

Regarding the ALJ's observation that Mr. Warren continued to cook, in her medical source statement, Dr. Raney was asked to explain why she believed that Mr. Warren could

11

perform part-time work at the assisted living facility as a cook but could not work perform competitive work on a full-time basis. She responded, "He can set his own schedule & work when he is able unlike competitive employment where he would have to adhere to time set by his employer." R. 688. This shows that Dr. Raney considered Mr. Warren's work as a cook and accounted for it when she formed the opinions contained in the medical source statement. And inasmuch as Dr. Raney considered it, Mr. Warren's work as a cook is not a basis to find that her opinions are inconsistent with the substantial evidence in the record. Rather, the ALJ's criticism appears to substitute her own opinion for that of Dr. Raney, which is not permissible. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1222 (10th Cir. 2004).

Finally, the ALJ found that Dr. Raney's opinion in her medical source statement questioning Mr. Warren's cognitive abilities is inconsistent with her treatment notes. During her initial intake interview with Mr. Warren on October 17, 2013, Dr. Raney noted that she believed his intelligence was within the normal range. R. 675, 678. In her medical source statement on March 6, 2015, Dr. Raney stated, "[Mr. Warren] has slow cognition, inability to get motivated to do work, daily chores … I have wondered if he has Borderline Intellectual Functioning but unable to determine due to his level of depression." R. 692. Notably, Dr. Raney's statement that Mr. Warren had normal intelligence was made the first time she met with him. Over the course of the next seventeen months, she met with him multiple times, and Mr. Warren provided Dr. Raney's treatment notes from October 29, 2013, November 7, 2013, December 12, 2013, January 9, 2014, April 10, 2014, July 10, 2014, September 4, 2014, November 13, 2014, March 13, 2014, and February 6, 2015. R. 677-83.

Without question, a doctor's first impressions of a patient's condition may be incorrect or incomplete. Over the course of treatment, the doctor will gather additional information through

tests, interviews, and/or examinations that will allow her to have a more complete and accurate understanding of the patient's impairments. The mere fact that a doctor's ultimate opinion differs from her first opinion is not a basis to reject her ultimate opinion. Indeed, a doctor's ultimate opinion, developed over the course of treatment as she obtains additional data about a patient's condition, will always be more reliable that her first opinion.

Such is the case with Dr. Raney's opinion. Initially, she believed that Mr. Warren had normal intelligence. However, she met with him at least ten more times over the course of seventeen months. During those meetings, she had additional opportunities to speak with and observe Mr. Warren, which would allow her to obtain additional information as to his cognitive abilities. With this additional information, she recognized his slow cognition and began questioning whether he has Borderline Intellectual Functioning. Inasmuch as this opinion is based on information she did not have when she first met with him, it is more reliable than her initial impression that he had normal intelligence. Thus, Dr. Raney's differing opinions as to Mr. Warren's cognitive ability do not support a finding that her opinions are inconsistent with the substantial evidence in the record.

Te ALJ's reasons for assigning little weight to Dr. Raney's opinions are insufficient to demonstrate application of the correct legal standard that governing the evaluation of a treating physician's opinion. Failure to demonstrate application of the correct legal standard constitutes legal error, requiring reversal and remand. Inasmuch as it has determined that this matter must be reversed and remanded, the Court need not address Mr. Warren's remaining arguments.[1] *See Madrid v. Barnhart*, 447 F.3d 788, 792 (10th Cir. 2006).

---

[1] The Court expresses no opinion as to the ALJ's treatment of Dr. Heyl's, Dr. Toner's, and Dr. Cotgageorge's opinions.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **REVERSED** and this matter is **REMANDED** to the ALJ for further proceedings. The Clerk shall enter a judgment in this matter.

**Dated this 9th day of March, 2018**

BY THE COURT:

*Marcia S. Krieger*

Marcia S. Krieger
United States District Court